IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| CHARLES K. LAY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 05-5111-CV-W-ODS ) |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits. The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in June 1960 and has a college degree and prior work experience as a salesman, store manager, insurance agent and real estate agent. He alleges he became disabled effective December 1, 1999, due to a combination of sleep apnea, obesity, and a kidney disorder. Plaintiff also suffers from hypertension and gout, but both conditions are being treated successfully and do not play a part in this case.

Plaintiff concedes that prior to 2001 he did not obtain treatments for any conditions he now contends are disabling. Plaintiff's Brief at 2-3; see also R. at 21. In January 2001, medical tests administered in connection with Plaintiff's application for health and life insurance revealed elevated protein values in Plaintiff's urine and he was diagnosed as suffering from proteinuria. R. at 203-04. Continued examinations and tests revealed no damage to his kidneys, and his doctor ultimately opined the condition was "possibly related to the patient's weight and diet." R. at 207. (Plaintiff weighed approximately 240 pounds).

In September 2001, Plaintiff saw a nephrologist (Dr. Robert Saylor). Dr. Saylor's initially opined Plaintiff's condition was "rather benign" but arranged to obtain the tests that were performed previously. In the meantime, he encouraged Plaintiff to lose weight, stop smoking and alcohol use, and monitor his blood pressure. R. at 218-19. A follow-up visit one month later revealed no significant change, and Dr. Saylor initially recommended a renal biopsy. Ultimately, it was decided to wait and gauge the effect of medication. R. at 217-18. Plaintiff returned as scheduled six weeks later, but had not been monitoring his blood pressure as directed. Nonetheless, he reported "feeling fairly well although slightly tired at times." Tests revealed the medication had improved Plaintiff's proteinuria although the need to adjust the medication still existed. Plaintiff was instructed to continue taking the medication and call in with his blood pressure readings. R. at 217. Plaintiff complied, and based on his blood pressure Dr. Saylor instructed him to continue taking the medication as prescribed. Plaintiff's weight at this time was 266 pounds. R. at 216. There is no indication Plaintiff saw Dr. Saylor again.

In late July 2002, Plaintiff was seen at Skaggs Sleep Disorder Center. Testing revealed he suffered from severe obstructive sleep apnea. He was prescribed medication, provided a CPAP machine, and advised to stop smoking and lose weight (he weighed 272 pounds at the time). R. at 234-35; 255-56. Plaintiff returned in September 2002; the report indicates the CPAP machine provided substantial relief but Plaintiff experienced "continued problems tolerating the CPAP because of severe rhinorrhea and allergic symptoms including sneezing and itchy eyes whenever he uses his CPAP." Plaintiff was not taking his medications regularly and still weighed 272 pounds. It was recommended that Plaintiff, *inter alia,* obtain testing to try to treat his apparent allergy to rubber equipment (which was theorized as the cause for Plaintiff's poor tolerance of the CPAP machine), consider surgery, use his medications regularly, stop smoking and lose weight. R. at 226-27. In February 2003, Plaintiff's medications were changed and the need to stop smoking was stressed again. R. at 251-52. On his own, Plaintiff arranged for an appointment with an ENT. R. at 253. On March 7, 2003, a doctor at the Regional ENT Center (Dr. Gary Highfill) examined Plaintiff and recommended he undergo surgery to alleviate a deviated septum,

2

elongated soft palate and mild macroglossia, as well as to remove his tonsils. Plaintiff did not make a final decision about whether to undergo surgery at that time. R. at 230-32.

On March 17, 2003, Plaintiff went to Skaggs Medical West for a blood pressure check. He also complained that the previous day he was working in his yard and upon awakening on this day he noted numbness in his right hand and was concerned he may have had a stroke. No signs of a stroke were found; he was diagnosed as suffering from neuropraxia (a temporary nerve dysfunction similar to striking one's funny bone) and given a prescription for seven days worth of Vioxx. At the time, he weighed 259 pounds. R. at 244-45. Approximately two weeks later, tests revealed the protein levels in Plaintiff's urine were normal and Plaintiff reported he was "feeling well" with no chest pain, palpitations, cough, shortness of breath or headaches, and his neuropraxia was resolved. He was again told to lose weight (Plaintiff weighed 260 pounds) and stop smoking. R. at 239-40.

On May 12, 2003, a consulting physician prepared a Residual Functional Capacity Assessment (RFC). The RFC indicates Plaintiff has the capability to occasionally lift twenty pounds and frequently lift ten pounds, stand or walk about six hours a day, sit about six hours a day, should never climb ladders, ropes or scaffolds or be exposed to fumes, odors, dusts or poor ventilation, and only occasionally climb ramps or stairs, stoop, kneel, crouch or crawl. R. at 265-72.

On December 15, 2003, one of the doctors from Skaggs Sleep Disorder Center wrote a letter confirming Plaintiff suffered from severe obstructive sleep apnea and that he had "been unable to proceed with further treatment options because of financial constraints." The letter further described some of the effects of the condition, including increased risks of heart failure and other cardiovascular ailments, strokes, and mood impairment. However, the letter does not specify any particular limitations on Plaintiff's ability to function. R. at 290.

During the hearing, Plaintiff testified he weighed 262 pounds, and in the preceding three years his highest weight was 286 pounds and his lowest weight was 242 pounds. R. at 43. He was also still smoking. R. at 56. Plaintiff had not made any efforts to lose weight or stop smoking within the year prior to the hearing. R. at 57. He is able to drive, but gets tired if he drives for more than an hour without somebody talking to him. R. at 44-45. He

was still working part time, averaging fifteen to twenty hours per week helping his wife by taking people to houses when she's busy, putting up signs, or working at the computer. R. at 45-46, 49. He denied any side effects from medication. R. at 46. He reported that his previous job as a salesman became difficult due to his exhaustion while traveling. R. at 47-48. In fact, Plaintiff's testimony focused on his exhaustion: unless somehow occupied with personal conversation, Plaintiff cannot stay awake for longer than three hours. R. at 49-52.

The ALJ elicited testimony from a vocational expert ("VE"). When asked to assume a person of Plaintiff's age, education and experience who was limited to sedentary work in an environment free fumes, dust and other environmental irritants and who needed to work that was unskilled, simple and low-stress, the VE testified such an individual could not return to any of his past work. However, such an individual could perform work as an information clerk or an account clerk. R. at 59-62. When asked to assume the individual could not sit, stand or walk for more than two hours each or for eight hours in any combination, the VE testified the individual could not work. R. at 62. Finally, the VE testified that a person who could only work every-other day could not perform work in the national economy. R. at 62.

In finding Plaintiff's subjective complaints were not as serious as he alleged, the ALJ noted (1) the absence of any medical reports confirming the degree of limitations Plaintiff described, (2) inconsistencies between Plaintiff's activities and his alleged limitations, (3) and Plaintiff's failure to adhere to his doctor's suggestions or obtain treatment. Based on her findings and the VE's testimony, the ALJ determined Plaintiff is unable to perform his past relevant work but retains the residual functional capacity to perform other work in the national economy.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the

4

Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Plaintiff's primary arguments involve the ALJ's assessment of Plaintiff's complaints. The critical issue is not whether Plaintiff experiences the effects of sleep apnea, but rather the degree of those effects. Cf. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
>     1. The claimant's daily activities;
>     2. the duration, frequency and intensity of the pain
>     3. precipitating and aggravating factors;
>     4. dosage, effectiveness and side effects of medication;
>     5. functional restrictions.

Case 3:05-cv-05111-ODS   Document 15   Filed 05/02/06   Page 5 of 7

> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

Plaintiff has augmented the record with information about sleep apnea that demonstrates the potential effects of the condition (including death or a stroke). Assuming Plaintiff may augment the record in this manner, the Court holds the information is not illuminating. A person with a condition that is terminal may or may not be disabled at any point in time; the question is not what the effects will be in the future, the question is what are the effects at present. The information might be more relevant if it suggested that certain activities exacerbated Plaintiff's condition or increased the risk of additional deleterious effects on Plaintiff's health, but this is not the case.

Contrasted against the information is the material actually contained in the Record. Notably, no doctor placed restrictions on Plaintiff's functional capacity. To the contrary, he was encouraged to exercise, stop smoking and lose weight – and Plaintiff has failed to abide by these instructions. Plaintiff has also failed to take medication as prescribed and has not taken the steps necessary to allow him to tolerate the CPAP machine (which the Record reflects provided him with significant relief). Finally, Plaintiff's activities support the ALJ's findings. Plaintiff performs work in his wife's business on a regular basis. He does not earn a lot in commissions, but not all of his work is designed to lead to commissions (e.g., working on the computer, posting signs, escorting his wife's clients). His daily activities and his statements to his doctors are also inconsistent with Plaintiff's testimony.

Plaintiff contends the ALJ failed to consider all of his impairments by omitting "obesity" from her findings. However, the ALJ accurately identified Plaintiff's residual functional capacity, and she was not required to parse out which limitations were due to obesity, sleep apnea, or any other conditions. Plaintiff also argues the ALJ's findings are inconsistent with her ultimate conclusion when she declared Plaintiff could "sit, stand and walk about 2 hours in an 8 hour workday." R. at 24. The Court agrees with the Commissioner that, viewed in context, the inclusion of "sitting" in this limitation amounts to a typographical error and is not a basis for reversal. E.g., Johnson v. Apfel, 240 F.3d 1145,

6

1149 (8th Cir. 2001) ("Any arguable deficiency . . . in the ALJ's opinion-writing technique does not require this Court to set aside a finding that is supported by substantial evidence.").

Ultimately, substantial evidence in the record as a whole supports the ALJ's decision. It may be that a different fact finder (or, for that matter, the Court) would come to a different conclusion. However, the ALJ's decision is fairly supported by the Record and there is no basis for reversal.[1]

### III. CONCLUSION

The Commissioner's final decision is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: May 2, 2006         UNITED STATES DISTRICT COURT

---

[1] Plaintiff alternatively seeks a remand for consideration of new evidence. Specifically, he refers to a letter prepared by a doctor at Skaggs Medical West. The report is from an exam performed in April 2005, and thus does not relate to the time period in question. Moreover, it reports Plaintiff still had not lost weight (he weighed 274 pounds) and still had not stopped smoking. It was recommended Plaintiff seek an ENT evaluation, but the report indicates Plaintiff could not afford to do so – but of course, Plaintiff *already had* a consultation with an ENT specialist in March 2003 and did not act on his recommendations. Ultimately, the Court does not believe the April 2005 report is material to the time period in question, nor does the Court believe it would result in a different outcome. Of course, Plaintiff is free to seek benefits for the time frame relevant to the letter in a separate application.